**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

NANO MAGIC, INC., Plaintiff,
a Michigan corporation,

v.

THE HILSINGER COMPANY PARENT, LLC
d/b/a HILCO VISION, Defendant,
a Massachusetts limited liability company.

_____/

## <u>PLAINTIFF'S COMPLAINT AND JURY DEMAND</u>

Plaintiff Nano Magic, Inc. ("Nano Magic"), by and through its attorneys, and for its Complaint and Jury Demand against Defendant The Hilsinger Company Parent, LLC, d/b/a Hilco Vision ("Hilco Vision"), states as follows:

### *Parties, Jurisdiction, and Venue*

1. Plaintiff is a Michigan corporation with its headquarters in Oakland County, Michigan, in the Eastern District of Michigan.

2. Defendant is a Massachusetts limited liability company, which at all relevant times has engaged in transactions and maintains substantial contacts in the Eastern District of Michigan in Oakland County, Michigan.

3. Plaintiff and Defendant formed and performed under the agreement at issue in this case in the Eastern District of Michigan, and, as described herein, Defendant breached the agreement and caused damages within the boundaries of this District.

4. This Court therefore has diversity jurisdiction under 28 USC §1332(a), because the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest, costs, and attorneys' fees, and this action is between citizens of different states.

5. Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. §1391(b)(1), as it is the District in which a substantial part of the events or omissions giving rise to the claim occurred.

6. Accordingly, venue and jurisdiction are properly laid in this Court.

### *General Allegations*

7. Plaintiff and Defendant have at all relevant times been direct competitors in various markets, including in the optical and retail industries for lens cleaning and anti-fog solutions.

8. Commencing in or around October 2025, representatives of Plaintiff and Defendant engaged in communications and discussions regarding the concept of an acquisition by Defendant of Plaintiff.

9. During the next several months, the Parties not only negotiated final and binding terms between them, but they also commenced contractual performance by and among themselves by coordinating the transfer of operations, inventory and assets to Defendant and the winding down of Plaintiff's remaining business.

10. Plaintiff engaged in this course of performance in reliance upon the material representations of various agents and representatives of Defendant during this time period of late 2025 and early 2026.

11. On March 13, 2026, Plaintiff and Defendant executed a binding Letter of Intent ("Agreement") "regarding the transition of manufacturing, commercialization, and ultimate ownership of certain Nano Magic intellectual property and related business operations." **Exhibit 1**, *Letter of Intent*.

12. The Parties expressly agreed that the Letter of Intent was "binding upon execution" and that "[e]xcept where expressly stated

3

otherwise, the provisions of this LOI are intended to be binding until replaced by a definitive agreement." *Id.*

13. The Letter of Intent further provided: "Until such definitive agreement is executed, the commercial framework outlined herein shall remain binding upon execution of this LOI." *Id.*

14. Pursuant to this Agreement, Hilco agreed to pay Nano Magic royalties on all sales of Nano Magic branded products or products utilizing Nano Magic intellectual property or formulations according to a tiered structure during the term of the agreement: 10% royalty on gross revenue until $5,000,000 in cumulative royalties was paid; 5% royalty on all gross revenue from $5,000,000 to $10,000,000 in cumulative royalties; and 0% royalty above $10,000,000 in cumulative royalties. *Id.*

15. This binding Letter of Intent contains all of the essential terms of the Parties' business relationship and course of performance and was intended to stand on its own "until replaced by a definitive agreement."

16. In full reliance upon this Letter of Intent, and pre-contractual representations, Plaintiff entered into an arrangement with its landlord to exit its lease early; wound down its manufacturing operation; laid off

employees; notified its customers of the partnership with Defendant; introduced Defendant to several important customers; liquidated certain inventory, tools, equipment and other assets; ceased pursuing other strategic alternatives; and relied upon Hilco Vision to become the supplier of record and fulfill its obligations pursuant to the Agreement.

17. All such reliance by Plaintiff was eminently reasonable, as the Agreement between the Parties was abundantly clear on its essential terms as to Defendant's immediately triggering responsibilities to perform certain actions and refrain from others in taking over Plaintiff's business.

18. Until such time as full payment was made, and commencing at least as of March 13, 2026, if not earlier, Defendant was required to take special care of the assets being transitioned by Plaintiff under the Agreement, including by "preserving the goodwill associated with the Nano Magic brand." *Id.*

19. Effective upon execution of the Agreement, all Hilco Vision-originated customers that transitioned to Nano Magic branded products, Nano Magic formulations, or products marketed as "Powered by Nano Magic" were to be processed, fulfilled, and invoiced directly by Hilco

Vision, with Hilco Vision paying Nano Magic the applicable royalty on such sales. *Id.*

20.    For Nano Magic customers, including but not limited to Walmart, Walgreens, and other retail or distribution partners, Nano Magic would work to transition its customers for Hilco Vision to become the supplier of record. *Id.*

21.    Upon execution of this detailed Letter of Intent, if not before, Nano Magic was to transition inventory to Hilco in order to support existing customer demand and future anticipated transitioned customers; whereas Hilco was responsible for reimbursing Nano Magic for the cost of inventory that it chose to be transferred, with the cost to be negotiated between the Parties. *Id.*

22.    As a further material inducement into this transaction, Defendant agreed to "promote, market, sell, and distribute Nano Magic branded products" in the same manner it promotes its own products.  *Id.*

23.    In reliance upon these extensive performance provisions and the various representations of Defendant's executive agents, Plaintiff opened all of its books and records up for full and complete inspection as to every single one of its customer relationships, broker relationships,

supplier relationships, cost-of-goods information as well as trade secret formulations, including solutions containing PFAS. In other words, Defendant was fully informed as to every aspect of Plaintiff's business and therefore had knowledge as to every facet thereof before it executed the Agreement.

24.   Defendant had its lawyers, accountants, and other professional advisors and agents fully inspect and review all of this information and complete due diligence of all matters and Defendant conducted an in-person site visit of Plaintiff's facility months before the execution of the Agreement.

25.   In the process, Defendant obtained Plaintiff's confidential customer lists, supplier pricing, formulations, manufacturing information, sales forecasts, retailer contacts, financial information and strategic plans.

26.   As stated, all of the essential material terms were contained in the Letter of Intent, and, as such, it even had very specific payment mandates.

27.   Specifically, upon payment of $10,000,000 in cumulative royalties, Hilco Vision would obtain full ownership of the Nano Magic intellectual property and brand.

28.   Pursuant to the binding Letter of Intent, Defendant assumed sole responsibility for fulfilling Plaintiff's customer orders, and the Parties initiated the transition of customers such as Walmart, Walgreens and various other "retail or distribution partners." *Id.*

29.   Having usurped control over all of Plaintiff's operations and assets, Defendant was contractually mandated to "manufacture, package, and fulfill Nano Magic products for all transitioned customers and channels using commercially reasonable manufacturing standards." *Id.*

30.   In other words, pursuant to the Agreement, (1) Plaintiff transitions its entire operation to Defendant, including all assets, books and records, and property of every kind; (2) Defendant manufactures and fulfills orders and otherwise takes over production; (3) Defendant pays $10,000,000 to Plaintiff pursuant to a royalty structure over time as sales commence; and (4) in the process, Defendant protects those assets and

does them no harm – and most certainly does not convert them to its own use without paying Plaintiff its fee.

31.     All essential terms were in the Letter of Intent.

32.     Following the execution of the Agreement on March 13, 2026, Nano Magic continued performing its obligations under the Agreement, including, *inter alia*, continuing to undertake efforts to transition inventory to Hilco Vision to support existing customer demand and future anticipated transitioned customers as contemplated by the agreement; communicating with customers regarding the transition to Hilco Vision as the manufacturer and distributor of Nano Magic products; preparing the inventory transfer and other tasks necessary to enable Hilco Vision to service customers with respect to Nano Magic products; and devoting substantial time, effort, and resources to implementing the commercial framework outlined in the Agreement.

33.     Then, just a few weeks into the contract, without notice, on March 31, 2026, Defendant sent correspondence to Plaintiff purporting to immediately terminate the Parties' Agreement. **Exhibit 2**, *Hilco Vision Termination*.

34. This alleged "termination" is defective and never took effect because said correspondence fails to provide the mandated six months of notice, as is required by the Agreement.

35. The purported termination was advanced in bad faith, in blatant breach of the Agreement and as part of a larger scheme to eliminate Plaintiff from the marketplace to remove a competitive threat to Defendant.

36. Though this purported termination was a mere two weeks after the Agreement was executed, the Parties had been performing under the "framework" described under the Agreement (Plaintiff doing so in reliance upon Defendant's representations as to said "framework").

37. Pursuant to the binding and fully enforceable Letter of Intent, any termination thereof unequivocally mandated "six (6) months written notice." **Exhibit 1**.

38. Accordingly, assuming *arguendo* that the termination was even effective, which it is not, Defendant was contractually required to continue full performance under the contract until at least September 30, 2026.

10

39. Rather than fulfill its contractual duties during this termination period, Defendant immediately stopped performing, proximately causing significant damage to Plaintiff.

40. By immediately purporting to terminate the Agreement without any valid cause and to suddenly quit performance under the Agreement without any notice whatsoever, after Plaintiff had committed its business enterprise to the control and custody of Defendant, Defendant not only deprived Plaintiff of the benefits of the bargain and the ultimate ownership transfer contemplated by the Agreement, causing damages in excess of $10 million, but it also caused significant other business damages to Plaintiff.

41. Had Defendant simply declined to proceed before inducing Plaintiff's transition, Plaintiff could have pursued other strategic alternatives, continued manufacturing, sought other manufacturing partners, preserved customer relationships, and mitigated its damages. Instead, Defendant induced Plaintiff to dismantle its business before abandoning the transaction.

42. As a result of Defendant's conduct, and the various coordinated and independently tortious conduct of the various persons

11

acting on its behalf, and who are *presently* non-parties to this litigation, Plaintiff has proximately suffered substantial damages, including with respect not only to entitlements for actual expectation damages under the Agreement, but also for damages to Plaintiff's business arising out of, *inter alia*, to loss of retail relationships, delayed product launches, lost sales opportunities, emergency transition costs, inventory transportation expenses, warehouse expenses, liquidation expenses, loss of goodwill and lost enterprise value.

## COUNT I
## BREACH OF CONTRACT

43. Plaintiff restates and reincorporates all allegations and averments as set forth herein.

44. Plaintiff and Defendant entered into a binding contract between them on March 13, 2026, namely the Letter of Intent. **Exhibit 1**.

45. The Letter of Intent constituted a valid and enforceable contract between the Parties and was supported by valid legal consideration, consisting of mutual promises and obligations undertaken by both Parties.

46.     The performance of the Letter of Intent commenced as early as October 2025, as it was being heavily negotiated and finalized.

47.     The Letter of Intent expressly states that its provisions "are intended to be binding until replaced by a definitive agreement" and that "the commercial framework outlined herein shall remain binding upon execution of this LOI." *Id.*

48.     Defendant materially breached the Agreement by, *inter alia*, purporting to terminate the agreement on March 31, 2026, in bad faith and without providing the six months' written notice required by the express terms of the contract. *Id.*

49.     Accordingly, the purported termination is null and void, and Defendant had a duty and obligation to continue performance until the natural termination of the Agreement, which would be until payment of the ten millionth dollar in royalties.

50.     Further, even assuming *arguendo* that the termination was valid, which it was absolutely not, Defendant had a contractual duty to continue performance until at least September 30, 2026.

13

51.    However, Defendant failed to do so, as it unilaterally and without notice ceased performance, proximately causing substantial damages to Plaintiff.

52.    By Defendant's breaches of contract, Plaintiff has been deprived not only of its royalty entitlement, but its contractual entitlement to continued performance as described herein.

53.    Furthermore, as a direct and proximate result of Defendant's breaches, Plaintiff has suffered substantial additional damages to its business.

54.    As a direct and proximate result of Defendant's breaches, Plaintiff has suffered damages including, but not limited to, the loss of royalty payments, the loss of retail relationships, delayed product launches, lost sales opportunities, emergency transition costs, inventory transportation expenses, warehouse expenses, liquidation expenses, loss of goodwill and lost enterprise value.

*Breach of Implied Duty of*
*Good Faith and Fair Dealing*
*{Statutory - Section 1-304 and at Common Law}*

55.    In addition to breach of the express terms of the Letter of Intent, Plaintiff further pleads that Defendant violated its inherent duty

14

of good faith and fair dealing as it acted in bad faith and in an unfair manner in performance of the various discretionary and other terms of said Agreement.

56. Specifically, under Massachusetts law – the choice of law under the binding Letter of Intent – there is an implied duty of good faith and fair dealing in every commercial contract as to the manner of that contract's performance.

57. This implied duty exists under common law and pursuant to statute.

58. Specifically, Section 1–304 of the Massachusetts Uniform Commercial Code provides, "[e]very contract or duty within this chapter imposes an obligation of good faith in its performance and enforcement."

59. As stated, there is a binding contract between the Parties.

60. The binding Letter of Intent expressly required, *inter alia*, Defendant to use "commercially reasonable best efforts" to promote, market, sell, and distribute Nano Magic branded products" and required Defendant to "commercialize the Nano Magic brand and products in good faith." *Id*.

15

61. In addition to violating the express terms of the Agreement, Defendant's manner of performance, by both misfeasance and nonfeasance, fell substantially below the bar of good faith and fair dealing, as set forth herein.

62. Defendant's actions were in bad faith.

63. As a direct and proximate result of Defendant's express breaches of contract bad faith performance of this contract, Plaintiff has proximately incurred damages including, *inter alia*, the loss of royalty payments, the loss of the benefit of the bargain, wasted expenditures in performing under the Agreement, disruption to customer relationships, damages to its business, and other various other damages.

## COUNT II
## PROMISSORY ESTOPPEL
*{Pled in the alternative to Count I}*

64. Plaintiff restates and reincorporates all allegations and averments as set forth herein.

65. As stated, from the time-period of October 2025 until March 31, 2026, the Parties engaged in extensive negotiations which culminated in the binding Letter of Intent.

66. During this period of time and before, Plaintiff reasonably relied upon the various promises that, *inter alia*, Defendant intended to perform consistent with the framework described in the Agreement, even before it was executed; that Defendant would act to preserve, care for, and maintain the value of Plaintiff's property; that in the event of a separation, Defendant would allow for 6 months of time to transition back to the status quo.

67. Ultimately, Defendant's various promises and representations were enshrined in the Letter of Intent, which is binding upon the Parties.

68. However, as an alternative measure, Plaintiffs plead this Count II for Promissory Estoppel.

69. As stated, Defendant breached various of its promises to Plaintiff, including, upon information and belief, their intent to perform under the Agreement.

70. Plaintiff reasonably relied upon Defendant's various promises and representations to Plaintiff's own detriment.

71. Upon information and belief, Defendant fully intended to breach all of its promises to Plaintiff at the time they were made in order

17

to take control of Plaintiff's business, rip off its customers, and eliminate or greatly disable a competitor in the marketplace.

72.     As a proximate result of these breaches, Plaintiff suffered significant damages.

## COUNT III
## UNJUST ENRICHMENT / QUANTUM MERUIT
*{Pled in the alternative to Count I}*

73.     Plaintiff restates and reincorporates all allegations and averments as set forth herein.

74.     As a result of the conduct described herein, Defendant obtained measurable benefits from Plaintiff.

75.     Defendant should not be permitted to retain such benefits as it would constitute an unjust enrichment, and it should be disgorged in the amount of the benefits and advantages procured by its unlawful conduct.

76.     Indeed, Defendant benefited greatly at the expense of Plaintiff, including by securing and accessing books, records, customer relationships, and otherwise by severely disabling a competitor (Plaintiff) in the marketplace.

18

77.   As a result of Plaintiff conferring measurable benefits upon Defendant, Plaintiff expected compensation, in the form of payment of ten million dollars in royalties, which Defendant was at all times aware of such expectation.

78.   Defendant should not only pay for the damages it has caused to Plaintiff directly, but also for the gain and advantage it has achieved as a direct and proximate result of its bad faith conduct.

## COUNT IV
## DECLARATORY RELIEF / JUDGMENT

79.   Plaintiff restates and reincorporates all allegations and averments as set forth herein.

80.   There is an actual case or controversy between the Parties, including with respect to the enforceability of the Letter of Intent, and Plaintiff, as a party to the Letter of Intent, has standing to assert a claim for declaratory relief/judgment

81.   Although the Letter of Intent is enforceable by its own terms, Defendant has contended that it is not enforceable because it lacks essential terms.

82.   To the contrary, the Letter of Intent contains every single term necessary for performance thereof, as evidenced not only by the

19

language contained within the four corners of the document itself, and as described herein, but also as evidenced by the conduct of the Parties.

83. In addition, Plaintiff requests a declaratory determination that not only was the Letter of Intent enforceable, but the Defendant breached it by purporting to terminate the Agreement without providing the 6-month mandated notice and without performing during that 6-month period.

84. As such, under the express terms of the *nonterminated* Letter of Intent, Defendant is contract-bound to have continued to perform thereunder, manufacturing for and servicing Plaintiff's customers.

85. Defendant was not permitted to suddenly and *without any notice whatsoever* simply stop performing and leave Plaintiff completely unable to service the business that had now been stolen by Defendant and its private equity partners.

WHEREFORE, as to all counts set forth herein, Plaintiff respectfully requests this Honorable Court enter a judgment in its favor and against Defendant, awarding Plaintiff monetary damages exceeding $10,000,000, as well as any other entitlements, including additional

20

damages, injunctive relief, costs and attorney fees, and all other relief appropriate at law and equity.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a trial by jury as to all counts pled herein.

Respectfully submitted,

**ROSSMAN, P.C.**
*Attorneys for Plaintiff*

/s/ Mark C. Rossman
Mark C. Rossman (P63034)
Isra K. Khuja (P85658)
T. Maxwell Carey (87922)
2145 Crooks Rd., Suite 220
Troy, Michigan 48084
248.385.5481
mark@rossmanpc.com
isra@rossmanpc.com
max@rossmanpc.com

Dated: June 30, 2026

## CERTIFICATE OF SERVICE

I hereby certify that, on June 30, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, thereby giving notice to all counsel of record.

/s/ Isra K. Khuja (P85658)

21